## APPEAL OF A. J. SCHWARZLER CO.

Docket No. 667.   Submitted February 4, 1925.   Decided January 30, 1926.

Where a taxpayer owns the fee title to land and erects improvements thereon, the cost of such land and improvements may not be abandoned and written off as a loss while the taxpayer retains title thereto.

*A. B. Sinclair, C. P. A.*, for the taxpayer.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before IVINS, KORNER and MARQUETTE.

This is an appeal from the determination of a deficiency in income and excess profits taxes for the year 1919 in the amount of $17,062.82. The deficiency arises from the disallowance by the Commissioner of an alleged loss of $90,257.83, claimed by the taxpayer to have been sustained in that year in connection with certain real estate owned by it.

### FINDINGS OF FACT.

The taxpayer is a corporation, organized under the laws of the State of New York some time prior to the year 1909, and it is, and has been since its organization, engaged in buying real estate in New York City, erecting apartment and store buildings thereon, and selling them.

In the year 1909, the taxpayer purchased for $47,500 the entire city block in New York City, bounded by One hundred and sixty-seventh Street, Clay Avenue, One hundred and sixty-eighth Street, and Teller Avenue. The land was a steep hillside, the street level of Teller Avenue being about 40 feet higher than that of Clay Avenue. It proceeded to divide the land so acquired into 28 lots, 13 of them fronting on Clay Avenue and 15 on Teller Avenue, and to erect buildings on the 13 lots on Clay Avenue and on the lot on the corner of Teller Avenue and One hundred and sixty-seventh Street. The fronts of the lots built upon were at street level and building on them was much easier and less expensive than upon the lots facing on Teller Avenue, for, although some excavation was necessary to bring the rear of the lots down to grade, the buildings could be erected on ordinary foundations, while, on the Teller Avenue side, it would be necessary to build foundations from below the grade of Clay Avenue up to the grade of Teller Avenue and to do a great deal of filling.

While the taxpayer was constructing the buildings on Clay Avenue and the building on the corner of Teller Avenue and One hundred and sixty-seventh Street, it also constructed, at a cost of about $70,-

000, the lower part of a foundation wall for back walls of buildings that might thereafter be erected on Teller Avenue. This wall extended vertically from below the level of the back yards of the Clay Avenue buildings to a line 25 feet to 35 feet above that level. The material excavated in grading the Clay Avenue lots was filled in on the Teller Avenue side of the wall, which was about 13 feet nearer Teller Avenue than was the back line of the Clay Avenue lots. The Clay Avenue buildings and the rear foundation wall on the Teller Avenue property were constructed between the years 1909 and 1913.

The erection of buildings on the Teller Avenue lots would, to a large extent, cut off the light from the rear windows of the Clay Avenue buildings, as the tops of the Teller Avenue buildings would be about 50 feet above the roofs of the buildings on Clay Avenue. For this reason, and on account of the much higher cost of building on Teller Avenue, the taxpayer, when it had completed the foundation wall mentioned, decided to defer further building on the Teller Avenue lots until a later date. About this time, or a little later, subways were constructed on Jerome Avenue, which attracted prospective purchasers away from the Teller Avenue property of the taxpayer and to property in the vicinity of the subway, and a large hospital was erected on the block west of Teller Avenue, with a high blank retaining wall facing the taxpayer's Teller Avenue lots and cutting off the light therefrom, as well as presenting an unattractive view to any building that might be erected thereon. The foundation wall erected by the taxpayer at the rear of the Teller Avenue lots crumbled, falling down in several places. These changes occurred prior to the year 1917, and, on account of them, it was apparent to the taxpayer, and was so decided by its officers, that further building operations on the Teller Avenue lots would be a losing venture, and that it would be cheaper to let them remain as they were, and to purchase lots in other localities for any other building operations the company might thereafter undertake.

The Teller Avenue lots were taxed by the City of New York separately from the lots on which buildings had been constructed by the taxpayer, and the taxpayer, from the time it acquired them, never paid any taxes or assessments thereon, but allowed the taxes and assessments to accumulate with interest. In the year 1917, the City of New York caused its tax lien on these lots to be sold for arrears in taxes, and, in the absence of other bidders, bid them in, but this sale was later canceled. In the year 1919 there were accumulated liens for taxes, assessments, and interest against the Teller Avenue lots amounting to $19,106.13. At that time the market value of those lots had decreased, for the reasons above stated, to less than the amount of the liens against them.

The cost to the taxpayer of the entire block of land purchased in 1909 was $47,500, and the value of the Teller Avenue lots was one-fifth of the value of the entire block, or $9,500.

The taxpayer, in the year 1919, sold the lots on Clay Avenue and the lot at the corner of Teller Avenue and One hundred and sixty-seventh Street, together with the buildings thereon. At the same time, it attempted to abandon the Teller Avenue lots, and charged off on its books the cost of the lots and of the foundation wall thereon as a loss in the year 1919. In its income-tax return for that year, it treated the whole business described above as one transaction, deducting from the price realized upon the sale of the buildings and the land upon which they were situated the aggregate cost of all the land and the cost of the buildings and the Teller Avenue foundation wall, and reported the difference as income. The Commissioner, in auditing the return, held that the dealings with the buildings and land under them constituted one transaction which was completed, and that the acquisition of the Teller Avenue lots and erection of foundations thereon constituted another transaction which was not completed. Of the purchase price of the land, he attributed $20,725 to the Teller Avenue lots, and of the construction costs he attributed $69,532.83 to the Teller Avenue foundations. The sum of these amounts he deducted from the cost of land and buildings sold, increasing net income by $90,257.83, and determined a deficiency in tax of $17,062.82.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 10 days' notice, under Rule 50.

### OPINION.

MARQUETTE: The taxpayer claims the right to deduct the cost of a parcel of land purchased in the year 1909, and a foundation wall erected thereon between the years 1909 and 1913, as a loss in the year 1919, upon the ground that the property was abandoned as worthless in that year. The Commissioner denied the loss, upon the ground that it was not a realized loss, as the title to the property was still vested in the taxpayer and no loss had been sustained within the meaning of the law. The taxpayer alleges that it abandoned the property in 1919 and wrote it off on its books as having no value.

Section 234(a) (4) of the Revenue Act of 1918 authorizes, as deductions in computing net income, " Losses sustained during the taxable year and not compensated for by insurance or otherwise."

The testimony produced tends to show that the property in question had decreased in value, due to changes in the neighborhood, that it was not desirable as a building site, and that taxes had been permitted to accumulate against it until they equaled or exceeded its then value. Assuming all this to be true, the taxpayer did not sustain a loss in the taxable year.

It is well settled that title to real property can not be lost by abandonment alone. 1 Corpus Juris, 10. In 1 Ruling Case Law, p. 2, section 2, it is stated:

> The characteristic element of abandonment is a voluntary relinquishment of ownership, whereby the thing so dealt with ceases to be the property of any person and becomes the subject of appropriation by the first taker.

In the case of 'East Tennessee Iron & Coal Co. v. Wiggin, 68 Fed. 446, 449, Judge Lurton, who delivered the opinion of the court, said:

> Precisely what is meant by "an abandoned" legal title is hard to define. If it is the valid legal title, it is inconceivable how it can be abandoned.

Here there is no question but that the legal title to the property attempted to be abandoned was in the taxpayer, and remained in it until after the taxable year in question. It could exercise dominion over it to the exclusion of everyone else, and it is difficult to conceive how it could sustain a loss with respect to the property and still have the property to deal with as its own. True, the value of the property may have declined by reason of changed conditions and the taxpayer's neglect to pay taxes thereon. In fact, every piece of property upon which taxes are permitted to accumulate and which is located in a neighborhood which has become undesirable, necessarily suffers a diminution in its market value, but it has never been held that a taxpayer could deduct as a loss the diminution in value of land the title to which is still retained, and the difference is one of degree only. Losses from dealing in real or personal property, growing out of the ownership thereof, are deductible only when ascertained and determined upon an actual, completed, and closed transaction during the taxable year, and are not sustained through the mental processes by which a taxpayer determines that the property is worthless and charges it off on its books, while it still retains the title to the property itself.

The taxpayer has treated the purchase of the tract of land described in the findings of fact, the sale of a part thereof, and the alleged abandonment of the balance as one transaction, but its own actions show conclusively that such was not the case, for the reason that, when it sold part of the land and the houses erected thereon, it

retained to itself the land the cost of which it now seeks to write off through an attempted abandonment. When the houses were sold, a gain or loss accrued to the taxpayer, measured by the difference between the cost and selling prices of the buildings and the land upon which they were situated. This constituted one transaction. Likewise, a gain or loss would accrue upon the remaining part only through a sale or other disposition thereof, which would constitute another and different transaction. The taxpayer seeks to complete this latter transaction by a book entry, based upon its own estimate of the value of the land. The purpose of the attempt to write off the value of the property not sold as worthless in the taxable year was to obtain a deduction which would in part offset the gain realized on the property sold and thus reduce the tax thereon. It may be that the equity of the taxpayer in the unsold lots was of little value because of the accumulated taxes, but we think that a loss is sustained, within the meaning of the law, only when it is a realized loss and is evidenced by a completed and closed transaction.

We are, therefore, of the opinion that a taxpayer may not deduct as a loss the cost of real estate and improvements, the title to which it retains; yet, even if we were to hold that the title to real estate could be abandoned and the cost thereof written off as a loss, we do not think the taxpayer would be entitled to deduct, in the year 1919, the cost of the lots and foundation wall involved herein. The taxpayer permitted taxes to accumulate against the property from the year 1909 to the year 1917, and in the latter year permitted it to be sold for taxes; and, if we were to recognize that it could and did, in fact and in law, abandon the property, we would be constrained to hold that such abandonment occurred not later than the year 1917.

The evidence produced in this appeal establishes that the taxpayer in 1909 paid $47,500 for the parcel of land bounded by One hundred and sixty-seventh Street, One hundred and sixty-eighth Street, Clay Avenue and Teller Avenue, and that the value of the lots on Teller Avenue, because of their contour and unfavorable condition for building, had a value of only one-fifth of the value of the entire tract. Therefore, $9,500 of the cost of the entire parcel of land should be allocated to the Teller Avenue lots and the remainder to that part of the land which the taxpayer sold in the year 1919. In other respects, the determination of the Commissioner is approved.